and that will be United States v. Moshe Porat. And we will begin with you, Ms. Shapiro. Good afternoon. May it please the court, my name is Alexandra Shapiro and I represent appellant Moshe Porat. I would ask the lead to have 15 minutes, sorry, 10 minutes of rebuttal granted. Thank you, Your Honor. The principal question in this appeal is whether mere fraudulent inducement is sufficient to establish money or property fraud. As numerous courts have held, the answer is no. There is no fraud when the putative victim receives the essential economic benefit of the bargain. That is what the Sixth Circuit held in Sadler. It is what the Eleventh Henry and that is what the Supreme Court suggested just last week in the Simonelli case when it unanimously rejected the government's argument that a wire fraud conviction should be affirmed on the grounds that the defendant had lied to obtain millions of dollars worth of development contracts. Counsel, we can certainly hone in on that argument, but much of the briefing was characterizing the argument as false information being made to a publisher as opposed to false information being made for purposes of ranking as opposed to false information being given to students or donors for purposes of obtaining funds. Are you setting aside that characterization, that argument, should we just focus for purposes of today on the sort of Sadler issue that you've now framed it? No, Your Honor, and I'm happy to address that issue, which was really the point two of our brief, I think, but I was starting with the fraudulent inducement point because I think that's our primary argument, but we're happy to, I do plan to address both, and we believe that either provides a sufficient basis for reversal. So on the fraudulent inducement and this idea that there's some distinction between deceit at the outset and not getting a fair exchange as a sort of separate matter, is that something different than materiality? Is there some sort of essence of the bargain threshold question that is somehow different from the element of materiality as we generally think about mail and wire fraud? Well, Your Honor, I think they're integrally related, but they are separate elements, and really what we're talking about with respect to the first level question of whether mere fraudulent inducement is sufficient, it really goes to the heart of what is federal property fraud? And, you know, obviously the Supreme Court as well as this court and other circuit courts have repeatedly held that there has to be, that what's being protected is a property interest and there has to be harm to property. And the Supreme Court has also, in the Nieder case, for instance, but in other cases as well, made clear that fraud needs to be interpreted based on the common law meaning of fraud. And it's, you know, what the court in Sadler was getting at, I think, and what the 11th Circuit was getting at was not only materiality, but a more fundamental concept that the object of the fraud has to be to harm the victim and its property interest. So, you know, that's why if now obviously fraud, federal wire fraud and mail fraud punishes schemes, so the fraud doesn't have to be completed. But the idea is that if the fraud, if the scheme goes to fruition and is completed, there has to be some sort of harm to the victim. So a fair exchange does not satisfy that. And here we believe it's clear that the, just as, you know, in Sadler the deal was pills for money, in Takalov the deal was whiskey for money, here the educational bargain was tuition money in exchange for the education and a degree. So when we look at, when we look at economic benefit though, I mean, I guess, do we look at it kind of on an objective absolute scale or do we look at it from the mindset of the defendant? And if the defendant thinks that there's a dramatically different value associated with something, for instance, the rankings might matter to the defendant, does it matter that the defendant's intent is that I'm telling you something that my mind has a very different economic value or do we say let's just dismiss that and let's just look at to see whether it has its own economic value? I think it has to be objective, your honor, and there's a separate element. Obviously the fraud statute, the defendant has to have an intent to defraud, but I think the object of the scheme has to be to obtain property and to determine, you know, whether it's a fair exchange, which is part of the property analysis. It really has to be an objective inquiry because if that wasn't the case, then the statute would potentially punish all manner of things that Congress clearly didn't intend to punish and that, you know, the Supreme Court has repeatedly, has repeatedly held, you know, the fraud statute isn't sort of an all-purpose morality enforcement. Well, how would the fraud statute apply to personal services contracts when you say I want, for instance, the greatest tennis player in the world to give me tennis lessons, that person doesn't provide the tennis lessons, even though that might have been what was induced, and then the answer is no, the person that gave you tennis lessons actually taught you way better backhand than the pro ever could, you're way, way, way better at tennis than you could have ever been, that person's a great tennis player, but they aren't a great tennis instructor, and you actually didn't get what you thought you got, the person dressed up as a great tennis pro actually taught you better. In your view, wouldn't that not support a wire fraud conviction? I don't think so, Your Honor, I think it depends on the context, and there may be hypotheticals, maybe slightly different from that, that would, so for instance, if, and there are cases like this, if I pay someone who holds himself out, for instance, to be a licensed physician, and, you know, claims they went to an accredited medical school and got a degree, and then, you know, maybe they give me good medical, they treat my condition, but it wasn't actually a doctor, that might be a very different type of scenario. But that's kind of close to this one, because you, because just as the, just as the non-licensed physician gave good medical care, the lower-ranked business school might have given the exact same knowledge that it would have otherwise given, but that ranking may have mattered, had economic value. It's very different, and when we're looking at, you know, what is the educational bargain, there's actually law on this, and the law, I think, comports with common sense, which is that what you're paying for with your tuition dollars is the education and the promise that if you do complete all the requirements, you'll get a degree. So there are numerous cases, actually, including interpreting Pennsylvania law to the effect that, to the extent there is some kind of an applied contract in higher education, that contract is to provide the education in exchange for the tuition dollars. And so, for instance, there are a number of cases in which plaintiffs in civil cases have asserted that they were deprived of something that I would argue is much more substantial, that is, in-person education, and courts have held that you don't even have a civil cause of action for that, these cases are dismissed on the pleadings, even where the student claims that things were advertised in brochures or on the website. This court in the El-Hadethi case, which we cited in our briefs, says that the essence of the educational bargain is that in return for tuition, money, and scholarly effort, the university agrees to provide an education and a degree. And, you know, if one were to accept that from the subjective standpoint of a prospective student who says, you know, I chose this school because of the ranking, that that were sufficient to demonstrate that the ranking was an essential part of the economic bargain, it would essentially license the U.S. government to enforce these rankings, which the government's own witnesses characterized as stupid, meaningless, pernicious, et cetera. But it was your client who, you know, over hundreds of pages of exhibits put – disseminated the ranking, in some way adopting it, and that's different than just saying a reliance or a student's reliance on a ranking played into their decision making. That's different if it's coming from the school, is it not? No, Your Honor. I don't think it is. And I think if you look at these cases like Sadler and Taklov and, indeed, Simonelli, the facts of Simonelli, it's the same thing. In Simonelli, for instance, the defendants claimed that they were given an opportunity to bid for these contracts based on a competitive process, and the government's proof established that that was false. And nonetheless, the Supreme Court held that's not enough to constitute wire fraud. In Taklov, the defendants lied to these customers. They pretended that the men were lured into the bar by these women who posed as tourists, and they said we wouldn't have gone to this bar otherwise. It's really essentially the same thing. In all of these cases, the defendants are the ones making the allegedly false representations. But these same cases are describing the sort of threshold question as whether it goes to the quality of the products or services, or sometimes they talk about it as the essence of the bargain. Assuming that is something objective, is it really something that a court can project, or do we need to look at the record and see, based on what's there, whether this was, from the perspective of a reasonable victim, this was sufficiently important that it went to the quality of the exchange? Well, I think, Your Honor, it has to be an objective inquiry, and that's the type of inquiry that was pursued in these other cases where courts have rejected this type of argument. And indeed, when you're looking at what is the essence of the bargain, it has to be something that's in the control of the counterparties to a transaction. So the ranking, just like many other things that someone might use to base their choice of a school, is not something the school can control. So for instance, if a school advertises a particular famous professor, and lures students in based on that professor, and the professor leaves, maybe even the school knew he was going to leave and didn't tell the prospective students, you know, that's not federal wire fraud. Just like if students go to a school because the school advertises its football team, and then all of a sudden cancels the football program. That's the rub, right? That a school shouldn't be able to control it. But in this case, based on the false data that was submitted, the school or your client did control it. No, Your Honor. With all due respect, that's not what the records report. It is true that we have to accept for the purposes of this appeal that false, that he knew that false data was being submitted. But the record shows that the U.S. News rankings, they're not, they weren't even like, they weren't a formula such that you could actually control the outcome. This data had some impact, but there were a number of subjective factors, including peer review of other schools and things like that. And there was ample evidence from both the government's so-called expert about the rankings, as well as other witnesses, that indeed these rankings were essentially a roller coaster, and that there was a lot of change from year to year with respect to the rankings. So it really wasn't in his control. But he hired a statistician to try to reverse engineer it. There's less volatility with that, right? It's, I mean, it's less... Well, I guess what I'm saying is that, is that it's true that somebody figured out, somebody could figure out how some of the data might be used, but the record as a whole does not support the notion that any particular school could completely control how it would be ranked, because there were a number of other factors that were totally subjective. So to the extent there, let's assume from the record here and jury's verdicts, that a reasonable juror could find a correlation between the false data submitted and the number one ranking, and did here. Going back to this idea of what constitutes the essence of the bargain, or goes to the quality of the product that's being delivered. If we talk about this in terms of the degree itself, or the education leading to the degree, isn't the quality of the degree, that is the reputation, the prestige, the rank of the school that goes along with that degree, part and parcel of the essence of the bargain? No, Your Honor. I think when we're talking about the quality of the education, we're talking about the quality of the instruction. And the testimony of the students was entirely consistent that they thought they got a great business education. Furthermore, as to the economics, they both got good jobs. One who was working at the Postal Service got a promotion. The other guy was continuing to advertise his Temple Fox degree on his website. There is evidence in the record from the students and from the government's expert that the rank added to the prestige of the degree, that it had consequences in terms of recruiters. You have a number of recruiters coming to campus. It had consequences in terms even of the quality of student who may end up matriculating in the program. Aren't those things that actually go to the quality of both the program and also that ultimate degree and its worth to the students who were attending? Well, I don't think that the record evidence actually supports all of those points. And I think it's a lot weaker than that and more nebulous in that, you know, the basic point these students were talking about were things like Darbigan said, you know, it felt good to be attending the number one school. And I think that these rankings, if this court were to hold that these rankings were an essential part of the economic bargain, the court would be empowering the federal government to enforce the rankings. And, you know, the Supreme Court has repeatedly cautioned and just in the Simonelli decision, the court emphasized yet again that, and I think the same applies here, the theory makes a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law. In flat contradiction with our caution that acts in a clear statement by Congress, courts should not read the mail and wire fraud statutes to place under federal superintendents a vast array of conduct traditionally policed by the state. But we're not talking about a right to control here. And in many ways, it seems like Simonelli is a fairly narrow opinion, with the court even gesturing that there may well have been a more traditional property right theory that the government could have pursued. They chose not to. Here, the charge is that the object of fraud was money, tuition funds, which seems to fall squarely in the nature of a traditional property right and traditional fraud. So how does Simonelli really assist when we're thinking about what value to the applicants and to students the number one ranking had? Well, again, I think Simonelli, although it is focused on the right to control, frankly, the concept of right to control is actually very similar to what's being put forth here. Because what the court holds in Simonelli is that the government's theory, which was that the alleged victim was deprived of information that might be economically valuable, that that's not enough to constitute a property fraud. And so depriving someone or being deceitful about information someone might want before they decide to enter into a contract is not property and is not covered by the statute. And I think that's really what we're talking about here. And Simonelli says that in isolation is not enough. But if it were charged as the contract itself, or if it were charged as the funds that flow from a contract, like in Cassisis, our circuit's recent case, why isn't that just a traditional property, right, and traditional wire fraud? Well, two points, Your Honor. First, I think that it's the same principle that the court rejected in Sadler and Takalov. And the Supreme Court cited Sadler with approval twice in its opinion. And Sadler and a similar case from the Ninth Circuit actually were the basis for the circuit split. Two cases from the Ninth Circuit, obviously the Yates case, which I'll talk about when we get to the second issue. But I think Sadler is a case where the purported victim set their own price and got their own price. This is an instance where – and Takalov specifically talks about the types of the statements that do constitute wire fraud and specifically states that fraud – false statements that go to the value of a bargain would be a proper basis for wire fraud. And unlike a fungible good like a pill where the victim is setting their own price and getting that price, this is a once-in-a-lifetime purchase that is not only a very substantial amount of money, but that each purchaser is valuing based on not only what they'll receive when they attend the But if the evidence was sufficient to support that that was the type of false statement that affects the value, where is the error of law? Can you point to an instruction or some other reason we should disturb that finding? Well, our claim is that as a matter of law, it's not sufficient because the essential economic bargain in an educational context like this is an exchange of tuition for education and a degree. That's what the students received. They testified that they were happy with the education they received and that they were using their degrees in the ways that they wanted to. So I think it is fundamentally the same situation. And what the court said in Takalov, the victims were claiming that they wanted to sell the pills to someone who was going to distribute them legally and that that was important to them. And Judge Sutton held for the Sixth Circuit that no, that's not enough. But that didn't affect the future value of the pills or how they were valuing them. I think that's a different qualitatively than a purchaser of an education assessing a non-fungible good and its future value, not just what they get when they attend school, but its future value. You know, as dumb as it might seem based on the government's own expert, if that's what the students made their decisions on and that's how they determined that the value and the jury found that. Well, because I think one thing that is very important here is that I think some of the court's questions reflect this. The government's argument seems like is that because money was paid, you know, we have a property interest. But the question is, what was the money exchanged for? And was there a loss, some kind of a potential economic loss as a result of the scheme? But doesn't Koussissis answer that? Thank you, Your Honor. I was just going to get to Koussissis. I think that Koussissis is materially different because Koussissis involved what the court repeatedly emphasized was a material breach of a written contract. In addition, the court also emphasized that there was a kickback or premium of 2.25% that the essentially, in numerous places in the opinion, the court emphasizes that what Penn DOT was paying for as demonstrated by the written contract was for the DVE to supply the paint. But back to your economic benefit point, the bridges got painted just the same. I don't think you can say, oh, that bridge has much, the paint on that bridge is much better because it's been done by a DVE. That wasn't part of Koussissis. And I think if you're saying now that we have to look at objective economic benefit, which is what your answer was to one of my earlier questions, if Koussissis says, look, the economic value of the paint was the same, but there was something else that we're accounting for overall, isn't that the same here where we see the economic value of the education is the same, but there's something else that affects what people value the education at, namely the ranking. No, I don't think it is, Your Honor, because in Koussissis you had a written contract that made clear this was a material term of the contract. It was a material breach of the contract. And in addition, the Penn DOT paid 2.25% more than they should have paid for the value of this paint based on the findings in the opinion. In addition, I think that Simonelli does cast doubt on the suggestion in Koussissis that the mere right to enter a contract is property, which is repeated in a number of places in the opinion. And I think that Simonelli makes clear that that is not necessarily sufficient to constitute property. But it just strikes me that you're switching between form and function when it's useful to use an objective value for the benefit obtained. We look at objective value, but then when it's time to say, oh, Koussissis is different because they actually, by the form of the arrangement, reduced it to a written contract. And I guess by that reasoning, had the number one ranking been reduced to a contract that students entered, this would be a different case in your view. Well, just to be clear, I mean, I understand this Court just decided Koussissis and I think there's a way to distinguish it. But as I said, I think that Simonelli cast serious doubt on certain aspects of the opinion and the ones that are most helpful to my adversaries. So I'm not, I don't want to be disrespectful to this Court. I think there's a way you can distinguish it. But I also think, and I'm sure the defendant in Koussissis will be filing a petition for rehearing. But I don't think the Court needs to go there, is my point. I think there are ways to distinguish it on its face based on the unique facts there and how they contrast to the ones here. Do you agree that the threshold question, looking at Judge Sutton's approach, I mean Sadler, and thinking about this as some threshold question about whether the misrepresentation is one that goes to the quality, the pricing, the essence of the bargain, how would you frame what this test is? And again, how is that different than materiality? So I think that Judge Sutton's formulation is a good one. I think the Court could also look to the older Second Circuit cases that recited region office supply and STAR, which talk about things like the quality, adequacy, or price of goods. STAR talks about the nature or quality of service provided. The service the university is providing is the business education. That's our view of this. I think that's the only objective way to look at this. And I think that property can't change from case to case. With respect to materiality, I think, as I said earlier, I think materiality is critical and there's a lot of overlap between the question of what is material and what is the bargain. And maybe on some level, they end up collapsing into the same inquiry. That is to say, obviously, if something is not an essential part of the economic bargain, then it can't be material and vice versa. So I do think there's a relationship between those two. If you think of the test as going to things that go to the quality, and as an appellate court, we're reviewing the record to determine whether there's sufficient evidence for any reasonable jury to conclude that this met that threshold, why isn't there enough in this record to find both that the victims, the students, including the government's witnesses who testified, from their perspective, that the rankings did correlate with quality. And not only quality of the sort of brand name, but also things that would go along with that, like employment opportunities. And then from a more objective perspective, for example, Mr. Byrne, the government's that there's also evidence that, in fact, as meaningless, quote, unquote, as he also acknowledged that the rankings were, that they correlated with the way the public saw the quality of an education, the employment opportunities that would go along with that, the quality of the students who would matriculate, things that seem to go to the heart of the quality of an educational experience, as well as the quality of a degree. Well, Your Honor, I think that what the students were really talking about was something more, the evidence you're discussing really reflects a subject evaluation that we're talking about here. And as I noted earlier, and I do want to get to my second argument. Your Honor, time. That's okay. Thank you, Your Honor. And we'll do the same with the government. So, excuse me, I think Justice Scalia put it well in his CCAR concurrence. He said, the property fraud statutes do not protect everything that a person holds dear. And the two students who testified were not able to identify any concrete objective economic problem as a result of these rankings. And I think it goes back to the common sense notion of what people are paying for when they get an education. And so, otherwise, I think the court would be endorsing the fraudulent inducement theory, which has been rejected by these other circuits. Because in those instances, for instance, in addition to the cases I've already mentioned, you have the Shellef case in the Second Circuit, and there's a similar case in the Ninth Circuit called Brookhausen, where the contracting parties, there's a provision that says that you can't violate certain laws after you've purchased the goods. And that was in the contract. And those courts both held that that wasn't an essential part of the economic bargain. So, that doesn't go to the seller's own pricing of this. This is a different situation where the students have multiple schools they can pick from. And they are deciding, to the court's point in Takalov, what is the value of the bargain? And in doing so, if the government's evidence, as found by the jury, was that these rankings went to the value – I mean, Takalov doesn't say – fraud in itself, if you look at blacks, is in part an inducement. The problem in Takalov wasn't that it didn't – was the inducement. It was that the deception didn't have any effect on the value of the drinks or the customer's estimation of the value of the drinks. Here, the evidence was for a very high-priced, once-in-a-lifetime good, where there are multiple choices for a student to make. If the jury found that this ranking was part of the valuation by a buyer, why is that something we should disturb? Well, again, Your Honor, I think that the proper inquiry is an objective one. And I also just want to highlight, as an example of that, that in the record, the evidence shows that Temple was far less expensive than several of the other schools that were lower-ranked and that the particular students were considering. Temple's tuition was something, I believe, slightly below $60,000, and other schools, like in the case of one student, was considering Syracuse and Carnegie Mellon, were over $100,000. The other students – And that argument was made to the jury, and the jury still found that this was part of the value of the bargain. Well, to be clear, I think that the question of what is the economic bargain, that our argument is that as a matter of law, these rankings cannot be a part of it, because as a matter of law, the educational bargain is what I said it was, tuition and the degree and – tuition in exchange for the education and the degree. But I will also point out that the jury wasn't specifically instructed to consider that, but our claim is a sufficiency claim. So the jury didn't actually have to think about that question. So if you begin to parse out what the economic value is, you say that it is tuition on the one hand, in exchange for education and degree in the other. And I think that everyone would agree that the degree has its own value. If you took all the classes that were needed to get the degree but never submitted your form that you want to graduate, you may have learned just as much stuff, but you don't have the degree afterwards. You only have the learning. And I think everyone recognizes that there's value in the degree. And one of the reasons that different degrees have – that the degree has value is what the reputation of that degree is and what it means. It's separate than the educational services because a person who took the exact same class as no degree probably didn't get the full value of their tuition as if they would have got the degree. Now we have to look at what determines the value for degree and you're basically telling us that rankings don't matter. I think the court has to conclude that in order to – yes, Your Honor, we're saying that rankings – well, there are two things. One is that I think that certainly one can talk about the value of the degree, but I would respectfully submit that it's just not the same as these examples like, you know, I bought a fake Rolex. It's not – a school's reputation can change over time for any number of reasons. When you pay tuition, you're not guaranteed that the school will keep its spot in these rankings, much less in, you know, more important – But sometimes third party does provide a really good assessment of value. Bonds get different ratings because of their reliability by outside rating sources. So sometimes an outside rating entity does bear on value. Every now and then you say, oh, the bond has been lowered in value and then its price drops. And so when a ranking goes up or goes down, isn't that very similar because it seems that what you want us to say is that third party rankings never can bear on value or is it a sufficiency point? It's not – the point we're making is that the court should look at what exactly the bargain is. And I think that's what the fundamental point being made in all of these other cases. And it's just – the ranking just isn't part of the bargain. That's our position. But there was – in the other cases, there was no third party valuation that matters. If you buy eggs, you can buy grade A or grade AA. If you buy meat, you can buy choice or prime. Somebody else makes that determination. That determines the value of the product sold. There's not some outside value used to determine pills or drinks or anything else like that? Well, you know, I think that – especially these rankings just cannot be compared to like a bond rating or something – you know, that is something that has an established market. There's a direct correlation between the price and the rating. As I said here, if anything, the price is the inverse. The price has nothing to do with the rating. Well, I mean, it is supply and demand. And even though price was lower and remained constant, we saw that that rating did lead to a doubling, nearly a tripling of enrollment. But the tuition – So that shows that there was a – I'm talking about the tuition. That just means that they attracted more applicants. Who spent money that they might not have otherwise spent at Temple. But again, Your Honor, I mean, I don't want to beat a dead horse. I think I've made my point, and perhaps – but I think the fundamental point here is that a mere fraudulent inducement isn't sufficient. And I think the correct test has to be an objective one as to the economic bargain, and that if the court goes down this path, you're inviting the Department of Justice to prosecute cases like the super lawyers and the Yelp example in our briefs. We're not – we wouldn't necessarily be saying that all third-party rankings matter, to use the language that you were using in your response to Judge Phipps. We're looking at this record to make a determination about whether it mattered to the students here. And when we look at this record and we have the testimony from the students, testimony from the expert, just the fact of the number of students matriculating went up by multiples. Why isn't that enough together to say that on this record, in this case, a reasonable jury could find that it did matter? Because the students' subjective claims are not enough to show that a reasonable person would think that this was part of the economic bargain, that this is what they were paying the tuition for. Let's put aside the student testimony. How about the expert testimony about how things work in the marketplace? Were held at the testimony of the Temple employees that their rankings did correlate with the numbers of applicants growing? It was part of – it was a tactic and a broader strategy to grow the program. Your Honor, I guess my point would be that all that goes to show is that the ranking may have induced prospective students to enroll. It doesn't address the question of what were their tuition dollars paying for, which was the education itself. Perhaps I should turn to the other argument. Let's – well, you make a number of interesting arguments. One, if you might touch on at least briefly, you talk about the term obtain as requiring there to be some sort of personal gain or benefit to a defendant. And I'd like to better understand how that fits into the way we think about fraud more generally. You know, if a defendant says, I don't want anything paid to me, but I'd like you to make the payment in exchange for what you're going to get here to my favorite charity, right, why is that any less of a fraud and does obtain – if we have recognized that, as we have, for example, in the FCPA context, why should we interpret obtain for purposes of 1341 or 1343 to mean that there has to be a financial gain to the defendant? Well, Your Honor, in the Skilling case, the Supreme Court talks about the concept that in federal property fraud, not honest services fraud, that the property has to be something that the victim loses and that is transferred to the defendant, that the two have to be images of one another. In addition, there are a number of other Supreme Court cases that also support this. For instance, in Honeycutt, the Supreme Court – those are different statutes, but they use almost identical language. The Supreme Court said that the obtain property language in one of the forfeiture statutes requires a showing that, you know, the defendant personally obtained the property. And so if it goes to a co-conspirator, that's not good enough to satisfy that particular forfeiture statute. There's a similar concept in the Supreme Court's decision in CCAR. So we're not saying that, you know, there can never be a circumstance where somebody else is actually getting it, but those would be situations typically where there's a clear that it's money the defendant would otherwise be out. Like one of the cases, I think the government cites involves a mayor who gets someone to pay for house repairs for his daughter. Or there's another case where the money goes to the guy's girlfriend. And so those are – there are many situations where even though the defendant is not personally getting the money, it would still be covered. But I think the mind-run of fraud cases is people lying to steal money. I mean, that's what's the heartland of what fraud is. And, you know, but I think – and other courts have also interpreted the obtain language in a similar fashion. But I think the stealing case – we recognize it can go to third-party beneficiaries. And the examples – and Kelly itself gives a couple of examples that suggest that the Supreme Court is thinking in those terms too for mail-and-wire fraud. Then why don't we have that situation here where your client is inducing the payment of these funds, they're – while he doesn't receive them personally, he, in effect, has them go to Temple and to Fox. Well, two points, Your Honor. First, with respect to Kelly, the passage I believe Your Honor is referring to is actually a little different in two respects. One, what the Supreme Court is talking about there is they're giving an example of a property fraud where the object of the fraud would be to get money. And that's the point the court is making. It's not about who gets the money. And secondly, the cases the Supreme Court cites are those types of examples I was just giving where if it's – you know, it's a co-conspirator essentially. And here we're talking – so maybe this would be a different case if, for instance, Mr. Porat was, you know, an owner of a business or something like that. But this is a nonprofit institution. He's not benefiting personally. The evidence was clear that, you know, his salary wasn't based on this. And to the extent the government – and I don't know if you want me to address it, but to the extent the government relied on a salary maintenance theory, that is invalid as a matter of law. As the cases the court cited in the focus letter indicate that maybe it would be different if you had a situation where someone was engaging in deceit in order to obtain a job or in order to get a higher salary. You know, for instance, in the Yates case, the court talks about the difference between those defendants whose salary wasn't tied personally to a specific performance – or sorry, their bonus wasn't determined by a specific performance metric but rather just by general performance. And the court said, you know, look, this just isn't enough. Even though that was – you know, the context there was a bank and there were lies about loans and things that clearly had a financial impact on the institution. So for all those reasons, I think it's very different. This context is very different. If my colleagues don't have questions about that, I would like you to address briefly your convergence argument. That's one – only the Ninth Circuit has adopted a convergence requirement. That's correct, Your Honor. And it's not something that's found in the text? It's not directly in the text. I think that it's supported by the scaling mirror image concept, and I think our fundamental point is that – here is that, you know, this case involved a very attenuated theory of fraud in terms of, you know, false statements to a publisher, students relying on the publisher to make a decision to give money to a nonprofit institution, and the defendant, you know, merely drawing a salary that has no direct relationship or even really very indirect relationship to those rankings. So I think that the convergence theory is just another way of looking at the fundamental kind of problem here that we have in terms of the disconnect between what the state – what the deceit is and, you know, the alleged loss of money. Does this also come back to just how we conceive of the question presented? That is, even the Ninth Circuit recognizes that where there's a, you know, intermediary that's acting just as a conduit, that the convergence is satisfied. And given the – again, some of the evidence to trial and the perspective that the government's report, the jury verdict, why shouldn't we think of what we have here as statements that were being made simply through the conduit of the U.S. News and World Report to the students themselves? Well, Your Honor, I think that that is – what happened here is much more indirect than what the Ninth Circuit was talking about in terms of a conduit. This is a third-party publisher, and as I mentioned earlier, even though there was evidence that some of the ranking was based on the information about what percentage of the students took the GMAT or whatever, there were a number of other factors that were completely outside the control of the defendant, including, among other things, review by peer institutions and various other kind of more nebulous, qualitative factors. And so it's very different from a situation where, you know, I lie to you – to a third party and then ask you to communicate the lie to the ultimate victim, and it's a very direct relationship. I think this case is way more attenuated. Okay. Thank you. Thank you. Mr. Dubnoff? Yes, Your Honor. Mr. Dubnoff, in the government's brief, its answer to the cases like Takaloff and Sadler was to point to the right-to-control cases. Those are obviously off the table now. Is there a better answer on the part of the government? Absolutely, Your Honor. And there are a few answers to it. First of all, it is actually quite stunning that the appellant is continuing to rely on Takaloff at all. What happened in Takaloff was that the defendant in that case, at the end of the trial, requested a jury instruction along the lines of, if you were to find that the victims got what they bargained for, that would be evidence that this was not a fraud. There was no request made in this case. In Takaloff, what happened is the Eleventh Circuit remanded the case for a new trial. There was a new trial of one of the defendants in that case. He was convicted, again, went up to the Eleventh Circuit. The Eleventh Circuit affirmed the conviction. The case is Feldman. We do cite it in our brief. And as part of that Feldman decision, Judge Pryor wrote a concurrence saying, essentially, I don't understand what we were saying in our Takaloff opinion. And there have been two other occasions since then. One is called Messino. I think the other is either, I think it's Walters, where they've noted the potential lack of presidential force of Takaloff in the Eleventh Circuit. But it is a dubious proposition that even in the Eleventh Circuit, if a defendant gives the victim the benefit of the bargain, that that would be sufficient. What is notable is that Takaloff was issued in October of 2016. Two months later, the Supreme Court issued its opinion in Shaw v. the United States. Now, we don't cite Shaw in our brief, but Your Honors asked us to look at Yates and some other cases. And Yates cites heavily to Shaw, both in the majority opinion and the dissent. And Shaw eviscerates this notion that the benefit of the bargain matters. Shaw was a bank fraud case. And Justice Pryor, writing for a unanimous court, said it doesn't matter whether the bank, essentially, was made whole. He quoted Judge Learned Hand from a 1932 mail fraud case out of the Second Circuit, where Judge Hand said, a man is nonetheless cheated out of his property when he is induced to part with it by fraud, even if he gets a quid pro quo of equal value. That's a 9-0 Supreme Court opinion that is wiping out the entire argument that the benefit of the bargain matters. But where is there any line, then, in false advertising or breach of contract and a federal felony? So that question goes to what Your Honor and Judge Chung were asking the Appellant Counsel about, which had to do with, really, a question of materiality. So this Court has repeatedly said that within the first element that we have to prove in order to convict somebody of wire fraud, namely, devising a scheme or artifice to defraud or to obtain money or property, that we have to prove that the misrepresentation or, to put it in terms of the statute, the false pretenses, representations, or promises, that they were material. We had to prove this in this case. And as Judge Chung repeatedly pointed out in her questioning of my colleague, that's a fact question. The jury found that these misrepresentations were material. They inherently did because they followed the Court's instructions and they convicted the defendant. And indeed, the materiality here, the argument that the Appellant has made today and in the statements that were presented on the record, statements like what he wrote in an email to the Temple community on May 1, 2019. And this is Government Exhibit 120. You'll find it at page 947 of the Supplemental Appendix. And what he did is he sent a letter to announce that he was about to sue Temple for defamation. And what Moshe Perot wrote is that these students, my Fox students, particularly our MBA students at the Fox School, and I'm quoting here, by the way, who deserve better, they made decisions to attend our university based in part on rankings, data that they thought to be accurate. A little later, I can only imagine how my students have felt knowing they made critical life decisions based in part on erroneous data. Our students are the real victims here. So everything she said about how these people got the benefit of the bargain, that they're not victimized here, contradicted by the defendant himself. Well, we can talk about what's in the record and whether it's sufficient to get over this threshold, whether we call it materiality or, as Ty Park did in his Cardozo article, sort of extra materiality. But in talking about what constitutes a benefit of the bargain or that threshold quality determination, is all we're really doing there looking at what is available in the record and common sense to say, as a matter of law, materiality couldn't be satisfied, that the misrepresentation goes to something that's simply too attenuated to the benefit of the bargain. Is that what's going on in these cases? Well, that's what they're saying. They're saying they're essentially conflating two distinct issues. They're conflating the issue, the factual issue of materiality, which is where we say this debate over the value of the rankings matter, with what they're essentially putting forward as a legal principle, that if somebody gets the benefit of their bargain, if a victim gets the benefit of their bargain, then as a matter of law, they cannot suffer any pecuniary harm. Therefore, as a matter of law, there is no male or wire fraud. That's the legal argument they're making. There is no basis for it. It was rejected by this court in Coussiss, it was rejected by the Supreme Court in the Shaw case that just came out. The key question is really just a factual one. The factual question of whether or not students would have thought this important, and more importantly, whether or not Dr. Perot would have thought students would have considered this important. We didn't just present the evidence that you're on a reference during your questioning of my colleague. It's not just the statement of John Byrne, the expert from Poets and Quants, who testified that the most important factor that students consider when deciding what school, the second biggest investment that many people will make in their lives after the purchase of a home. It's not just a factor, it was the most important factor. He testified that there were surveys showing they considered rank and reputation to be the most important thing in deciding where to go to a business school. It's not just his testimony. It's not just Ibrahim Fattahi's testimony, and it's not just Erisar Darbagian's testimony. Erisar Darbagian testified, as you know from the record, that among other things, he would have gone to a different place. He went to the Fox School of Business because of that number one ranking. Now, Appellant's trial counsel argued, well, that doesn't matter. He got a great education. And that's an argument he made to the jury that this essentially wasn't a big deal. He presented witnesses in the defense case in chief to say, we donated money to the Fox School of Business. We didn't care about the rankings. And then in his closing, he argued, see, the rankings don't matter that much. But the jury rejected that in less time than has been allotted for today's oral argument. But Mr. Dudnoff, couldn't this just be a door-opening type deceit, like the B-Girls in Taklov, which I know you have questioned how precedential that is? But, you know, we're number one, we're number one, we're number one. That's just a way to get people to click on the link. I mean, the government's own Exhibit 100, which shows the website, I presume, of what it's shown, certainly it does mention it, but the content is all about the Fox Online MBA offers a market-driven curriculum. It fosters a tight-knit community. How is that not just a way to get students to read what the substance of their education is going to be? To get the clicks to induce students just to find out what, in fact, the quality of their education is going to be. All right, so I have... And is there any evidence in the record of more reliance on that to say, like, well, you know, our number one ranking reflects that we have the best faculty? Or is there any evidence that Fox itself or Mr. Porat connected the ranking to the quality or the future value when targeting the students? So, absolutely. And I have a four-part response. But I'm going to answer the last thing you said first, which is yes. There are Exhibits 48, which was a photograph that he took after the rankings came out. I can... Your stock is rising. Your stock is soaring. Was this poster... It's 2017. Online MBA is number one. Part-time MBA is number seven. Was that published to students? No, that one was not. But we do have this idea... Well, we do have this speech he gave at graduation in 2017 to graduating Fox students, donors, potential donors... And this is going to get me to my second point on Exhibit 100. Donors and potential donors, where all he does is compare a Fox diploma, a Fox MBA to a share of stock. And he says, your stock is soaring because of the rankings. And he goes through a list. And it's not just the US News and World Report. It's not just OMBA. It's Princeton Review. It's Financial Times. He goes through a litany. So, we know that the defendant himself tied that. That's great marketing. I mean, that's rhetoric. But when we have the government's own experts saying that these rankings are, in fact, meaningless, how can you say that in one breath and in the other that this is so essential to the decision-making of the students? Because what the expert said is that it doesn't matter whether they're meaningless. The students place great value on it. And because the defendant knew that the students placed great value on it. That's why he put all those advertisements out that your honors were referring to on the radio, on the TV, on the billboards, Exhibits 26 through 45. And getting back to your question on Exhibit 100, Exhibit 100 was the January 22, 2018 email that Dr. Peratt released, which said, for the fourth year in a row, Fox's OMBA program has been ranked number one. There are other representations in it. And he sent that not to everybody, but to the Peratt 100, a list of people who were donors. And the jury saw Dr. Peratt testify at a sworn deposition. We had a videotaped deposition. We played excerpts of it. And they saw Dr. Peratt say under oath that at the time he sent out that email containing fraudulently inflated rankings, he knew that the number one rankings were based on false information. And the third point I want to make, and this ties into the entire argument they've made here, because you asked about inducing and where do we draw the line. So we heard an argument today that Appellant didn't even make in the principal brief. In the brief, the lead question, according to the Appellant on page one of the brief, the question presented on appeal is whether submitting false information to a publisher of higher education rankings is a federal crime. Today they say the question is whether fraudulent inducement can be the basis of a federal wire fraud charge. That is a completely different tact. And it's also, it's easily answerable. Because the Supreme Court, the very first case that ever interpreted the mail fraud statute was a fraudulent inducement case. In fairness to Appellant, and they've also argued throughout their brief, pointing to these sorts of cases, like Takaloff, that there's a difference between deceit at the outset and what constitutes a fraud. And saying fraudulent inducement seems like just another way, another term to use for the idea of separating out deceit from a fraud. Let me ask you to focus on, we now know, we've got Kelly, we've got Simonelli, we know that this idea of just the right to control, the right to make an informed decision, and maybe even a better economic decision, standing alone is not sufficient. Absolutely. So in the case before us, if you take that piece out of what the students were doing here, why are we left with that fair exchange? That is the quid pro quo of they're paying a certain tuition for the quality of education. There's no premium. Temple didn't say, we're going to add a 2.25% premium on top of this, right? And they were prepared to, for the students who came the year before, the year after, even with fluctuating rankings, or students who didn't look at the rankings at all, they're all paying the same tuition, right? I mean, you would agree that there's not, if the students come on board when Fox is ranked number six, and the following year, in their second year, that it falls to number 15, there's no breach of contract action, there's no, right? We're not alleging any breach of contract, and we're not trying to suggest that every aspect of deceit is a federal crime. That's not at all what we're suggesting. So how do we have then here, if we take out that concept of a right to control, just having some, the accurate information, before entering into the decision, if, as Sadler puts it, the decision is otherwise a fair exchange, why is that a fraud? Well, again, Sadler predated Shaw, and it's probably not good law in light of, or at least that portion of it probably isn't good law in light of Shaw's statement that it doesn't matter whether there's a fair exchange. It doesn't matter whether you receive a quid pro quo of equal value, but I agreed with your interpretation of the Simonelli decision. I think you're dead on that this was a narrow decision, and if you look at Justice Alito's appellant counsel, Mr. Dreeben, if you read the transcript from the oral argument, it seems pretty clear that the Supreme Court is leaving open the door that on remand, the Second Circuit can consider whether this error in considering the right to control theory, whether it was harmless, and there are a number of other things that are left open. So the question of whether or not the defendant, Simonelli, can be held responsible for using fraud to obtain money is still an open question, and that's what this is. It's not the right to information. It's not a right to control. Accurate information has nothing to do with this. This was a scheme to deprive people of money and to obtain money, and there is nothing more at the core of the federal fraud statutes than false and fraudulent pretenses, representations, and promises made to separate people from their money. And let me just follow up on that on kind of the people in play. It strikes me that the heartland of your case is the prospective students who matriculated, who enrolled, and became students, but a few minutes ago in, I think, one of your four-part answer you gave, you mentioned that there was also letters to donors, and one of the things that we're looking at, or at least that concerns me, is kind of this line drawing between when do the federal wire and mail fraud statutes grab every form of deceit, and when do they kind of target something that isn't just anything that was that, and is it just a question of materiality? You know, where does that play out? And I want to tease out a little bit about that donor point, because I'm curious. Let's just say that your case rested only on the email to donors, right? Just all the students, just out of the equation in the questions. We sent an email to donors saying we're now number one. Is that going to be a basis for a wire fraud conviction? Does it need to be followed with evidence that donors actually gave money based on that and solely that, or is that evidence just kind of going to show that there was a scheme, that there was a mens rea, there was the other thing? So I'm kind of curious, does that provide a line drawing device to say, when do the students, and we can tease it out, we can see it's tight, we can see it's very material, but the donors, the evidence of materiality and the evidence of reliance on that to change conduct and depart with their money isn't quite as strong. I don't know if you get all that. I tacked a lot in, but what do you think about the donor email on its own as a basis for wire fraud? Well, the donor email on its own is a basis for wire fraud, and it doesn't have to be successful. There's plenty of law saying that all we have to prove is that there was devising a scheme or artifice to defraud or to obtain money or property by false and so on. So the first part of your, I'm still trying to answer the rest of it. The second thing is that it's important to note the way the Supreme Court has drawn the doctrines with regard to the interpretation of the federal fraud statutes, right? You have the line of cases that talks about limiting the application of the fraud statutes to cases involving money or property, right? We can start with McNally, Skilling, Kelly, Simonelli, clearly that's one line of cases. There's a second line of Supreme Court cases that says once you're in the ballpark of money and property, then this statute is to be interpreted broadly. In McNally itself, they cited to Durland. They talked about how Durland read any scheme or artifice to defraud broadly enough to encompass future crimes. The same court that issued the McNally opinion four months later issued the Carpenter opinion, unanimously I believe, which said essentially that you have a property interest with regard to the Wall Street Journal confidential information there. So you have to... Take care of property but not materiality. And where is there, I mean it's telling that the government didn't put on a single donor witness to say this mattered to me. In the absence of any evidence that this mattered to any reasonable donor, why should we uphold a conviction? It seems like it may well have rested on a count that raises some duplicity concerns. Because we defer to the jury and the decision of how much weight to place on the jury's finding that we proved materiality because... And to the donors?  So the three elements, and I'm happy to get into the jury instructions, but within the first element, devising a scheme or artifice to defraud or to obtain money or property, along the lines of that as we start to go into more of this court's model jury instructions, there is language there about materiality. Notably, by the way, there was no request for an instruction by appellant's trial counsel along the lines of the request made in Taklov or something that would say, listen, if you find that no donor was harmed or everybody got the benefit of their bargain, then there can't be fraud there. Because that's not the law. And there was no request made in the district court. And so no, we do not have to show, at least under existing Third Circuit law, that everybody who was a potential victim of this crime, somebody whom the defendant targeted with his fraudulent scheme for money, actually gave any money. We don't have to do that. We don't have to prove the success. But Judge Krause asked you about the materiality of the representation to how much it affected the recipients. And so even if you don't have to give money, couldn't it still be material or immaterial? I mean, so I guess another way of saying it is you're saying we would still have a case even without any evidence that any donor ever gave any money. Absolutely. But there might have been other things in that email. Suppose there was other things in that email that said, we now have padded seats in our classroom, right? Are we to say that's material too? It just depends. I mean, if I could, it goes to the second element that you require us to prove. Which is an intent to defraud. An intent to defraud means an intent to deprive somebody of money or property. So if there are false representations that a defendant makes for the purpose of depriving somebody of money or property, like in Coussis, the same argument that is being made by the appellant today, it was argued in the principle brief, the reply brief, 420HA letters and an oral argument by the appellant in Coussis. And this court foreclosed that argument. It doesn't matter. We keep asking about materiality, you keep talking to us about other elements, like property or the intent to deceive. We have here, isn't it just as likely that in getting information that Fox was now number one, that a donor would feel like, I don't need to give because it's rising in the ranks on its own and so it had no effect whatsoever? Isn't the burden on the government to show that it in fact was material? Yes. And where is there any evidence in the record as to materiality to donors? So again, it's not from the, because according to this circuit's law, it's not from the perspective of the victim with regard to the materiality. When we're talking about intent to, and I'm happy to explain why it's material because we certainly argued why it's material, but there is evidence that the defendant gave testimony under oath that he used all of these rankings to help with fundraising. That's what he did. So we have an admission from him that he considered this material and that's the evidence, that's part of the evidence that we showed that there was an intent to defraud. But whether a defendant thinks something is material or not doesn't answer materiality. I mean, Dr. Porat might have thought that the color of the new carpeting that was put in was something that would be important to donors, but him telling that would not automatically make it material because that was his subjective belief. So I'm not trying to duck the question on materiality. What I'm suggesting is that it was a fact question, but let me tell you why, what we argued as to why it was material. Because of course people consider the rankings important. Nobody goes to a business school just for the quality of the education or certainly there are enough people out there who go to business school for the brand, for the ranking, who consider it material. And we presented evidence to indicate that these are factors that people consider all the time in deciding where to go. Now you're switching to the students. And I think part of what Judge Phipps was asking you about is we have a single substantive count of wire fraud. And you can read that substantive count as incorporating two different objects. One to obtain tuition funds from students and another to obtain donations from donors. To which clause, if you will, the specific act that is alleged in the indictment of the substantive offense is a transmission that is only about donors, not about students. So what's the significance if we conclude that there's no evidence that would allow a reasonable jury to conclude that there was a fraud scheme with its object of obtaining donor funds because there's no evidence of materiality that was put forward by the government? So again, we don't have to prove that. We have to prove that the defendant devised or intended to devise a scheme to defraud either students or applicants or donors or to obtain money from any of them. That's what we had to prove. The wire transmission you're referencing was a wire transmission identified as being used in furtherance of the overall fraud scheme. We simply don't have to show that anybody relied on that particular wire transmission. In fact, what we have to prove is that the defendant at the time he sent that wire transmission was doing it to further the scheme. A jury found that he was. But how does that further the overall scheme? Because it would seem to further a portion of the scheme, that portion being the donors. And to Judge Krause's and Judge Fitts' point, you know, whereas there was evidence in the record that students considered future value of a degree and how a ranking might impact that, whether or not a donor said they donated or not, there seems to be a paucity of evidence that any donor found that material in how they valued their donation. So, you know, maybe if there was a statement that, hey, we got an A, give us ice cream sort of thing to the donors, or, hey, you – now your stock is soaring, you want to keep it soaring, you better donate to us. That might be the kind of deceit that is material rather than door opening. And if there is no proof as to materiality towards donors, then how does a donor email that doesn't contain any material misrepresentations as to donors further a scheme overall? I think we're in a disagreement between the concepts of materiality and reliance, and reasonable reliance. Because for reliance, we would have to show that a donor relied on this. If this were a civil fraud case, we would have to do that. But it's a criminal case, and that's just not an element we have to show. No, I think that the question that you're getting is, where is there any evidence to show that it mattered, that this would influence the decision-making of a donor? What we have, for example, is his speech in Exhibit 148, where he's addressing the graduates and telling them that their stock is soaring. We have his admission that he used these rankings, all of them, for the purpose of and that's all we have to show. We have to show that he considered it material. He considered it important. So materiality goes to the subjective belief of the defendant. It's not an objective standard? No, it's both. It goes to both the question of intent to the fraud. We have to show that the reason why he did this was because he was trying to obtain money. And we have to present enough evidence by which a reasonable fact finder could conclude that the defendant devised a scheme to deprive either. And again, we don't have to show each category was defrauded. We just have to show either under your model instructions. Either students or applicants or donors. We don't have to show all three. Just like we don't have to show, and I can get to the jury charge issue, we don't have to show both a scheme to defraud people. I don't think that's what this line of questioning is suggesting. I think it's more just the third element. It has to be in furtherance of or carrying out or advancing the scheme. So how is it in this instance, given the record before us, how is an email to the donors advancing the scheme? Okay. So I now understand that I believe your honors are asking questions that have not been raised at all in any of the appellants. To be fair, yes. So these are not arguments that were raised in any of the briefs. Correct. And so to some extent, we would submit that they've been waived. But I would also submit that it's common sense that the reason, and we do instruct the jury that they can use their common sense to draw reasonable inferences. And why else would he be sending an email to recruiters? Why only? And there was evidence that he limited the number of people who received this email blast touting the number one ranking. So for example, there was evidence indicating that there are multiple mailing lists that he had. Mailing lists that go to other schools, for example, that would brag about the number one ranking. He didn't send that one out. We presented evidence that that email didn't go out. The email that went out on January 22nd, and the only one he approved was the one to donors. And a reasonable jury could infer that that's because he wanted them to give money. And that's all we have to prove. It sounds to me that the answer to your question is really just going to be context specific. If the email was entitled new carpets or cushion out of the seat, then somewhere along the line, it said, oh, by the way, we got the number one ranking. That might be a different question in terms of was that incidental? Was that material? How did that play out? But it sounds to me that the answer that you keep coming back to is just look at the email. It was everything. Number one ranking probably couldn't play much more prominently than that email. Yeah, then it did. I mean, font size, stuff like this may be given. But I think your answer is just it's fact driven. And on these facts, it was clearly material. There could be other facts where it was part of an array of reasons, but it just played so prominently here that we just have to trust the jury in their finding of materiality. That seems to be the answer that you're gravitating to. It is the answer, Your Honor. OK, I agree with that analysis. I would like to just respond briefly, if I could, to this idea that we had to show that a fraud defendant personally profited from the fraud scheme. First of all, they never raised that argument as a basis for dismissal of the indictment in the motion to dismiss. They never requested a jury instruction saying, if you find that my client didn't personally profit, or if you find the defendant didn't personally profit, then you can't convict the defendant. They never argued that point in the motion for acquittal or for a new trial. So my first point is that that's waived. I would then say that there's a reason why trial counsel never made that argument, and that's because it's contradicted by binding third circuit precedent in the Riley case. And we cited the other case where they're third party beneficiaries, but you can have a situation where you engage in a fraud scheme to benefit a third party. There's nothing in the statutory text, or in the history, or in any Supreme Court case I'm aware of, that says that we had to prove that the defendant personally profited from the fraud scheme. Isn't their point that we have a Supreme Court that is focusing us much more on the text and the plain language? And at least in the context of forfeiture and Hobbs Act, we've got cases from the Supreme Court that are interpreting obtained to mean that you've personally acquired. This isn't a forfeiture context, Your Honor. It'd be different if we were seeking to forfeit his funds that he personally tried to disgorge him of his assets. But that's simply not a requirement of the fraud statute. We don't have to show, and there's no language in any Supreme Court fraud case that I'm aware of, or any third circuit fraud case. In fact, it's contradicted by Riley, and it's contradicted by Delano. This court cited, as part of its citation of Kelly, in the Koussissis case. It was cited by the Supreme Court in Koussissis. There's the Pavey case. There are plenty of hypotheticals you could think of where you'd have a fraudster who is trying to deprive the money from a victim without benefiting the fraudster directly. So there's no legal basis for that particular argument. What's the reason for the fact that there are other statutes, for example, 18 U.S.C. 495, that talk about whoever falsely makes, alters, forges a deed, power of attorney, receipt, contract, or other writing for the purpose of obtaining or receiving, or of enabling any other person, either directly or indirectly, to obtain or receive? Where Congress wants to sweep in third parties, it seems to know how to do so. What do we make of the fact that it didn't include any language like that here? Nothing. I mean, what we can make of Congress's intent with this statute is what the Supreme Court in McNally said we should make of this intent and what the Supreme Court in Carpenter said. In McNally, the Supreme Court gave essentially a very detailed legislative history, and it looked at the statutes enactment in 1872 and noted that it was written, whoever uses the mails to essentially initiate a scheme or artifice to defraud, and then in the Durland case, the Supreme Court said, you interpret this broadly. It's not just limited to misrepresentations about the past or present. It's also, you also interpret it to deal with fraudulent inducements, misrepresentations about the future. So you look at what the Supreme Court has said, and the Supreme Court has said that once you're in the realm of a scheme to deprive somebody of money or property, then you interpret this broadly. And if you don't like the way it's being interpreted, you go to Congress and say, we need to narrow this. But the Supreme Court has said, once you're in the realm of money or property, interpret it broadly. And of course, there's logic to this because we can't conceptualize all the different ways, and Congress couldn't conceptualize all the different schemes that people would dream up in order to deprive people of their money or property. They wanted a statute that would be broad enough to stay ahead of the criminals. If you outlined every single way that somebody could be held responsible for a scheme or artifice to defraud, a smart criminal would come up with some clever way to do a workaround. They drafted the statute broadly for a reason. It's been on the books for 161 years. And once we're in the realm of money or property, and we are in this case because we're talking, just like in Coussis, and just like in Shaw, in the Supreme Court case, of a clear case to deprive somebody of money. So you think there has to be some limit, right? Not every civil action involving a false representation that leads to someone, you're buying something, is a wire or mail fraud violation, right? For sure. Not all misstatements are fraud. There's a difference between, as we acknowledge in our brief, most of the cases that stand for the principle that not all deceptions are defrauding people. And if anyone, there has to be a loss, right? Or at least intended loss. Yes, there has to be an intent to either deprive or obtain money or property. And both of those mean to intend some loss as to property, right? Money or property. Actually, that's not the case. The Shaw opinion, and again, I apologize, I didn't have it in the brief because we saw it from the Yates case that you asked us to review. But the Shaw case, I'll recite the facts, and it's clear that you don't have to do that. In Shaw, the facts were that you had a defendant who gained access to an account holder at Bank of America. And used that person's account information to transfer funds from that person's account to an account in a different bank, which the defendant then accessed. And the defendant in this particular case was charged with bank fraud. And the defense he raised was, I didn't intend to defraud the bank. I just intended to defraud this particular account holder. And besides, the bank was made whole. And the Supreme Court said, you don't have to prove that the bank suffered any harm. And you don't have to prove an intent to cause economic harm either. That's not an element. And while that's the bank fraud context, one of the things the Supreme Court did in order to reach that conclusion was to cite a mail fraud case, the Judge Lerman Hand opinion that I cited earlier. And I think there was an actual, whether or not it was to the bank, the account holder did experience a theft of their money. For sure. And do you find that to be of no relevance in that decision? Only because it's a bank fraud case. So you have to be hard. So it has to be the bank that's the victim in a bank fraud case. It was under 1344, not 1341 or 1343. So yes, in that particular case, and that's the whole defense, he was essentially saying, maybe I committed wire fraud, but I didn't commit bank fraud. And the Supreme Court said, no, you committed bank fraud. We didn't have to show, or the government didn't have to show, that the bank actually suffered, or that there was an intent to cause economic harm to the bank. That's just not known. So since we're talking case law, always a fun topic, right? Your friend on the other side distinguishes, consists of, if I'm fairly characterizing it, is being distinguishable from this case in two respects. The first is that that case involved a written contract where we know that DBE status was material. And the second is that there was a premium paid, 2% and change paid for the DBE status. I'd like to give you an opportunity to say, do you agree that those are reasons that Consensus loses its persuasive value here? Or do you think that those maybe don't cause it to lose its persuasive value? I think those are distinctions without a difference. No, Consensus applies directly here. It doesn't matter whether there's a contract under that theory. I mean, you'd be excusing a lot of fraud schemes where you don't have a written or oral agreement between the fraudster and the victim. There's no case law I'm aware of that would support such a bizarre result that would accrue from the appellant's theory there. And the 2.25% premium that was paid to Marcus, that was part of the holding. There was another way that this court found that the victim had been harmed, but it wasn't the only way. I mean, this court held that the reason why there was deprivation of money or property, or at least a scheme to deprive people of money or property, is because that's what they did. They took about $70 million from one contract and $15 million from another contract, the Amtrak contract. Money is money. So, no, there's no... So, metaphorically, would that, or analogously, maybe stronger still, would that 2.25% be kind of the equivalent of saying, if in this case you had evidence that Fox increased its tuition, maybe based on the rankings, and you don't have to show that as your position, but the 2.25% could be analogous to an increase in tuition. Yeah, I'm trying to compare things. I don't know if that works. Or enrollment. I mean, what you have here is an additional $40 million in revenue that we could trace directly, or nearly $40 million to the fraudulent representation. So, what do you think of that? Because, again, your friend on the other side says, well, we don't have evidence that tuition went up, but we do know that enrollment went up. And so, can enrollment going up evidence that there is some degree of increased economic benefit associated with the number one ranking? Or when we assess economic benefit, are we kind of stuck at looking at tuition? There's no reason why you'd be stuck looking at tuition. One of the things you can look at is the defendant's manuscript for his book, which is part of the record. I believe it's Exhibit 150, where he talks about how important the rankings were to increasing enrollment, to fundraising goals. I mean, these are the main things that a dean bases his or her value within a university community on. Increasing enrollment, increasing fundraising. I apologize. I see my time is up. I'm happy to answer any additional questions. You can keep going. We'll let you know when we're done. Okay. Thank you, Your Honor. So, there's plenty of evidence to show that there was a benefit. So, no, you don't have to tie directly to tuition, and we didn't have to show a hike in tuition or anything like that. Is foregoing following through with a Ball State application a premium? I think your second student testified it was $40,000 cheaper. I think it was Salisbury State. I believe it was. I may be getting it confused in my... Oh, no. I believe you're right. And then there was the other student, Mr. Patahi, who chose Temple instead of going to Syracuse. And so, we're not arguing that it's the... We're certainly not arguing that it's a loss to the other school. Maybe I'm misunderstanding your question. Is that a premium paid by the student in that they have opted to go to... I realize I have the opportunity to say, yes, it is, but I don't think it is because you never know whether a particular school is charging more or less tuition in that particular context. All that matters is that these students were deprived of their money. They made one of the biggest investments they're ever going to make in their lives, and it was based on a fraud. But your argument that they were deprived of their money, that they suffered any injury or that any injury was intended, turns on the ranking mattering. Right, yep. And I want to go back to this distinction with Casesis because I think it may be a bit more nuanced in terms of the argument that Ms. Shakira was making. And that is the fact that it was included in the contract, the DBE certification as being something that was essential to the parties. That is proof of materiality, right? In a way that these third-party rankings here can dispute. They may or may not be. But we have there concrete proof that it was something that was important to the parties, so much so that they put it into their contract and designated it as essential. And that they attached a price tag to it, the premium that the government was prepared to pay to have a certified contractor, right? Here we don't have the increase in tuition. And while you're pointing to the increase in enrollment, that doesn't answer the question about whether or not there was a fair exchange when you look at what was paid and what was received. In essence, did it really matter? I guess I misunderstood perhaps Judge Phipps' question trying to equate the tuition with the kickback, essentially the 2.25% payments that were being paid to Marcus. As your honors will recall, the argument that Coussis made in its appeal, or his appeal and his co-defendant's appeal, was that the Pennsylvania and United States Department of Transportation actually saved money, right? That they paid less to go with him and Alpha because they lied about their use of DBEs. And so this court rejected that particular argument. And so I thought Judge Phipps was asking whether the fact that the Departments of Transportation nonetheless paid 2.25% to Marcus essentially, to the defendants who passed it on to Marcus, whether that was something that was essential to the holding or something that we'd have to compare to tuition. And if I misunderstood the question, I apologize. But that's what I thought he was asking. I'm saying we don't have to show anything like that. And it wasn't critical to your honors holding in Coussis. So let me just follow up on that question. This is a bit of a hypothetical and it involves valuation. But let's say that before any of the fraudulent statements were ever communicated to the ranking entities, the value of a Temple education, a Fox business education, was $50,000 and that's exactly what they charge. Let's say that if those false statements were true, the value of a Fox education would spot because they would lead to the right. So you could say, okay, a number one business school education is now worth $75,000, right? Because there's a difference. The rankings make a difference in value is your whole theory. But what if Fox still just charged $50,000? At one level, couldn't you say, well, we could have charged more because the fraud is a number one business school is worth $75,000. We never did. We just cared about boosting enrollment numbers, doing other things. So really, we weren't trying to defraud somebody. We charged the same amount before and we charged the same amount after. And so, you know, in terms of the deceit or the economic benefit or the economic loss, you got the exact same thing before is after. And that's certainly an argument that you can make and let a jury render a factual ruling as to the materiality of the lack of a price hike for the tuition. As to whether what Fox was trying to do was increase overall revenues by making, by whether Dr. Perot was trying to increase overall revenues at Fox through his false and fraudulent representations. However, he did it. I mean, one of the things that you could argue in reverse. And in fact, I would like to direct Your Honor's attention to two specific exhibits that are in the supplemental appendix. And these were government exhibits 66 and 67. And these are email communications between Dr. Perot and one of his co-conspirators, Dr. Gottlieb, where they specifically talked about the impact that an increase or decrease in the number of enrollees would have on the bottom line for Fox. Hey, in exhibit 66, when we became number one, this led to an increase. Our enrollment in the online MBA program soared. If you figure $45,000 tuition, which was the wrong number, but that's what Dr. Gottlieb said. If you figure $45,000 tuition plus 100 additional students, you're talking about $4.5 million a year. And then there were some emails back and forth about how you incentivize certain people at Fox to help keep that number one ranking. And then there was exhibit 67, which was the September 2015 email initiated by Dr. Gottlieb to a number of people where there's talk about, hey, if we can get into the top 30, if we can crack the top 30 for the overall MBA program, this could lead to $700,000 a year. And he did his mathematical calculations as to how he could get to that. So that gets more people in the door. But if you're doing false advertising to get people in the door, and then what you're charging for the items in your shop is actually the market price, and they're buying market price, are we going to call that a federal fraud? And how would we then draw the line, look, we live in an era where we've got promoters online, right, who are just upping the game as to multiple different products, how many hits there are on a particular product. We've got things like Angie's List or Super Lawyer, all these third-party reviews. Is it going to be a mail or wire fraud every time there's any deceit that informs simply the ranking that gets people in the door? So two parts. To your last question, no. To the first question regarding the market price, I would just say market price for what? They're not going to Temple just for the education. People select a business school for the degree, for the value of the degree, for the brand, for the ability to go into the marketplace and say, look, I have an MBA from this particular institution. It's not Ball State or some other place. It's the number one online program in the country. It's the number seven part-time MBA program in the country. Who's to say what the market price is? They could lower the price and the fraud would still be the same because it's designed to increase revenue. But we've got a record that shows that. As Judge Phipps was asking, what happens when you have years and years of this same tuition being paid by people without any false statement, any deceit in the picture? And when it remains that rate of tuition, or even lower as a rate of tuition during this period, how is there anything but a fair exchange going on? Because, and again, I'd cite the Supreme Court in Shaw that it doesn't matter whether somebody receives a quid pro quo of equal value. That's not relevant to the fraud analysis. What matters is whether somebody lied to obtain somebody else's money. That's according to a unanimous Supreme Court. So this idea that like 60,000, 70,000, 50,000, it doesn't matter if they lied to get the 60,000. If it had been 50,000, they would have lied to get the 50,000. If they had increased it, they would have lied to get the 70,000. They lied to get the money that wasn't there. I'm not seeing then any limiting principle, because that takes us to the hypo in, I believe it was in Sadler. They may have been tackle-off, but if someone reaches out to their neighbor to say, got an emergency, a sick child, to get the neighbor to come over, and their real purpose was to exchange a dollar for four quarters, and that's what they do, you're suggesting that as long as that crosses state lines, we've got either a mail or wire fraud. No, because you're not depriving somebody of money. That's a little different where you're talking about, I'm giving you $5, you're giving me $5. That's, or $1 for $1. That's a very different situation than when you're, sorry. No, no, no, it just strikes me, I was just completing the thought to make sure I was tracing what you're thinking about. In essence, what you're saying is a transaction that wouldn't have otherwise happened, regardless of its valuation, happened because of the fraud. And you're saying that that has to suffice as opposed to something else. It's still, it might be a limiting principle, but it's not a particularly big limiting principle. So I think to some extent the analogies we're talking, the super lawyers, the dollar for four quarters or whatever it is, I think that trivializes what happened in this case. And I think it's really important to think about the facts in this case. As your honor put it, this is one of the biggest investments that people make. They could have, they knew they wanted to go to business school. They knew they wanted to go to an online program. They knew it would be expensive. They had to choose where to go. They put their money here because of the lies. So is it then that in the Taklov example, the follow-on example was it's the fake dollar as opposed to the real dollar? A counterfeit dollar for four quarters, yes. The increase in students is that before the ranking, only X number of students thought the value of a Fox education was the tuition amount. After the ranking, an exponentially larger number of people thought the value of the Fox education was worth the tuition. Absolutely. Absolutely right. And to use the counterfeit dollar example that your honor raised, this would be like exchanging counterfeit $40 million in exchange for real $40 million. That's what was going on here. This, I realize, again, I'm happy to answer any additional questions. I realize I know your honor has asked me to discuss some cases. I mean, you're calling it counterfeit, but I guess it's just back to, it was the same tuition that was being charged for the same product before the fraud. Before the fraud, it was not a degree that was being marketed to people for the purpose of getting them to say, look, I don't, people don't go to business school or maybe they do, maybe some do just for the education. But I think you gave the example of, you could go to school, get an education, but there's something different about the diploma, the degree. What Fox was selling with the rankings was the degree. That's certainly what Dr. Perot considered to be a value. Dr. Perot told everybody, you have a share of stock. It's increasing in value because of the rankings. But the money that was paid for that was the same before the fraud as afterwards. It could have been lower and it still wouldn't matter because the idea is that they were taking people's money through fraudulent representations, just like in two systems. The defendants, the defendant received less money than an honest contractor would have received. An honest contractor who was going to use a DDE, who wasn't going to defraud PennDOT or the United States Department of Transportation, would have cost the agencies? That's been the opposite of what I thought you were answering to Judge Phipps because then in the hypothetical of somebody being lured to come over to their neighbor's house based on a lie with an exchange of the dollar, a real dollar for the four quarters, the government's view is they were induced to go through with that transaction by fraud, by false statement, and that makes it a fraudulent scheme that add in the other elements for interstate transmission or mailing and that takes you to a federal felony. I'm not saying that. And again, I do think that when we're talking about these small dollar amounts, we're trivializing things. And it's not people aren't going to the school to get just an education. They're going to get the brand. We talked in our brief about Rembrandt, for example. You could get a Rembrandt that, or you could get a duplicate of a Rembrandt. To the untrained eye, you could look at it and say, I don't know the difference. But that's the point. A real Rembrandt would cost a lot more money, right? Because people pay more money. Here, if we've got a record telling us they didn't pay any more money, then where is the criminal case? I mean, we have before us and the witnesses who came forward for the government were named plaintiffs in the class action. There are civil remedies. There are state law remedies that are available for things like false advertising or consumer fraud or breach of contract or unjust enrichment. And they pursued those in the class action. What makes this a criminal case as opposed to that being the right avenue? Don't the courts need to draw a line somewhere? So I have two responses. The first is that they're paying $60,000 more than they would pay because they wouldn't go to Temple. They would have paid $0 to Temple but for the misrepresentations. So that's the point I was trying to make. It's $0 versus $60,000. Temple gets none of it but for the lies that Moshe Perot and his co-conspirators made. The second point, where do we draw the line? The idea that this could be civil. Certainly it could be civil. And I would like your honors to consider the posture that we're hearing today. The arguments that were actually raised in the appellant's briefs. So the appellant's briefs, as you probably noticed, raised their three principal arguments they raised. The indictment failed to prove things or failed to allege things and the evidence failed to prove things. For the most part, they don't cite any error by the district court. They're not invoking this court's jurisdiction to find error in anything the district court did except with regard to a jury instruction issue, which we haven't even touched on. Mostly what they're doing and what both Amakai are doing in this case is they're asking you to essentially exercise prosecutorial discretion in a way that they think we exercised our prosecutorial discretion on. They're asking you to essentially not just be a 13th juror and reach a different verdict but to say, you should elect this resolve civilly. That's really what they're saying here because they're not citing any error by the district judge. Well, they're citing error in denying the motion to dismiss in the Rule 29 motion. They're not. They're not. The only one who cites that error is one of the Amakai in one of their briefs. But they don't say the district court erred in denying the motion to dismiss or denying the motion for acquittal. We had to, in our response, say they're implicitly saying that. But what they're doing is saying we shouldn't have brought this as a criminal case. And this was a $40 million fraud. Real people were harmed. And I would just ask the court to, as it's considering things, to take a look at Judge Pappert's description of what happened here in his sentencing opinion. It's worth reading. It describes the real harm people suffer. We've read it. Let me just make sure that I understand the government's position, which is that the line to be drawn between civil cases that should be pursued under state law and federal criminal fraud is that we defer to the government's discretion. I'm not going that far, Your Honor. What I'm saying is that the Supreme Court has indicated that when you're talking about the federal fraud statutes, once you get to a scheme to deprive someone of money or property, they are to be interpreted broadly. And it's not the place of a court to act as essentially a super prosecutor. It's your job to limit us to the bounds of the statute. So, of course, we can't prosecute a crime under the mail and wire fraud statutes. That's not prohibited by the statutes. We can't prosecute a non-property crime, and in this case, it was a money crime. And what we're saying is that in this particular case, this was a massive fraud, a monetary fraud. Real people were harmed. Real people were harmed. There was evidence. We did present Mr. Katahi and Mr. Sardarbagan's testimony about the civil lawsuit. They were not made whole. They got $5,000 apiece, and these were named plaintiffs. They were out a lot of money, and they were out a lot of money because of the defendant's false and fraudulent representations. I am not asking the court to make any broad, sweeping grants of defense.  Okay. Thank you, Your Honor. Thank you. Ms. Buren? Thank you, Your Honor. Just a few points. First, I think this is fairly obvious, but I just want to emphasize with respect to the argument that we have an identified error. Our claims, except for that one jury instruction claim, our claims have to do with the sufficiency of the evidence based on the correct, what we maintain is the correct legal principle. Obviously, that's reviewed de novo, so it doesn't really matter that much, except to the extent you find it persuasive what the district court said about those things. And the same holds true for the motion to dismiss. It seems fairly clear from the exchange that Your Honor's had with my friend on the other side that there is no limiting principle and that ultimately, the government's theory does come down to a mere fraudulent inducement. He clearly articulated a viewpoint that the government doesn't have to show any intended loss. That is simply incorrect as a matter of law. He mentioned the Shaw and Rowe cases. The fact of the matter is those cases were extensively addressed in the briefing of Simonelli because the government relied on those cases and the Supreme Court implicitly rejected those arguments based on its opinion. In addition, the Rowe case, that's the Learned Hand case, is an old Second Circuit case. And in two subsequent Second Circuit cases that we've cited in our briefs, Starr and Regent Office Supply, the Second Circuit essentially said that statement by Judge Hand was dicta because in the Rowe case, the victim was clearly cheated and didn't get what he paid for. With respect to the question of why mere fraudulent inducement isn't enough, I just want to say a few more things about that. The Supreme Court has said in the Nieder case and others that one interprets the terms in the fraud statute based on the common law unless Congress suggests otherwise. And I would urge your honors to read Mr. Michael Dreeben, the former Deputy Solicitor General of the United States who represents Simonelli. In his brief, merits brief to the Supreme Court, he goes into detail about why at common law the mere fraudulent inducement theory that the government is effectively advocating in this case is not valid. At common law, a fraud plaintiff had to show damage. And that includes rescission and other forms of fraud, fraudulent claims. And so, sorry, rescission meaning someone fraudulently induced someone to enter a contract and the plaintiff goes to court to try to get the contract rescinded. In all of those cases, the plaintiff has to show harm. Clearly, the federal fraud statute doesn't require actual harm, but it does require a scheme that if carried out to completion and if the scheme is successful, would cause damage. So I'd urge the court to read Mr. Dreeben's brief, which lays those arguments out in detail. Now, we do have tons of circuit law in this area. And my friend on the other side tried to disparage it. But the fact of the matter is that the Sadler case from the Sixth Circuit was cited twice in the court's decision in Simonelli with respect to the 11th Circuit decision in Takalov. It was, in fact, reaffirmed in the Wheeler case. It was just the concurrence that my friend is citing. We also have, in addition to the two, the Starr and Regent Office applying in the Second Circuit, the Shelliff case, which we also cited in our brief, as well as the Ninth Circuit's decision in Brookhousing, which, again, is cited in the Supreme Court decision in Simonelli. And all of those are based on the common law meaning of fraud. What do you say to Mr. Dubnoff's argument that there was loss here, there was the loss of the entire tuition for all of those who would never have attended Fox but for the false ranking? Well, those people would have, they got what they paid for. I mean, and I think similar arguments were made in all of these other cases. You know, in Takalov, for instance, you know, obviously the people lost their money, but they got the drinks. In Sadler, the manufacturers lost the pills, but they got the money in exchange. So it's no different than those things. And indeed, you know, these individuals, as I mentioned earlier, you know, testified that they got the degree, they used it to get jobs. It's not like they lost, they didn't lose their money. They just got something in exchange for it. It's very different from your Honor's example about, you know, the counterfeit money or he brought that up. The counterfeit money, there was no loss here. My very first question to you a while ago had nothing related to personal service contracts, where it's an individual person that will be providing the tennis lesson. And it does seem that the more that the individual that was providing the instruction is really, really important in that case. So much so that I think it's unquestionably material. And so it would strike me that if it wasn't the person, they were in disguise or something else like that, that that would be a basis for wire fraud, if it was communicated through the wires and on and on. But do you agree with that? And is the fight just really about materiality, the role of the rankings? So I don't know that if you finish your answer to that, but I was just wondering if there's... I think that it really depends on all the facts, but it might be. So for instance, that could be a case for fraud, but it would be very different because if you're purchasing the unique characteristics of that individual and his talents and what he can convey in the educational process, and it turns out it's not really him, but an imposter, then the person is not getting what they paid for, even if the other guy was a decent teacher or whatever. Or a better teacher. Well, maybe, but it might be... It depends on how you frame the hypothetical. You could say the reason I chose... I'm not that up on tennis, but let's say an orange judge and I hit an instructor is because of the particular way that he hits home runs and I want him to teach me that thing. And if it's somebody else, they can't do that. And so that would be like if I chose Fox Business School because it had a particular way of instructing or... I'm not even... Maybe you're answering my question because I said, does it just all come down to materiality? And it seems to me that maybe you're saying it does all come down to materiality. Well, I think... How material it was... I think that's accurate in the sense that when these courts are talking about the essential economic bargain, they're looking at what was material to the economic bargain? What was the heart of the bargain? What was the person paying for? So in that sense, it is similar, I would say. But I think the hypothetical you're giving is materially different from what we're talking about here. Because it's the attributes unique to the instructor, not what other people say about the instructor? In that particular example, yes, Your Honor. And here what the educational bargain is that you're paying to, you know, take courses in accounting or finance or what have you in order to get an MBA. And I do want to mention just very... Sorry, one other quick point about loss, which was... I just did want to highlight that in addition that Kelly talks about the need for the object to be causing loss. And even in Koussissis, the court does talk about loss needing to be an object. That's at page seven of the slip opinion. And the court talks about intended economic harm being required at page 19, note 80. One just very quick point about the donors, and then I wanted to turn briefly to the obtain issue. With respect to the whole interchange Your Honor's had with my adversary about the donors, I think what's clear is that the government's theory had alternative potential victims. They did not prove any materiality as to donors. They didn't call any donors. The only donors who testified said they didn't testify. The rankings had no impact on their decision to donate. And there were other things, and there was a general verdict. So I think what we're talking about is a verdict that Your Honors are reviewing that we can assume the jury found that there was a fraud on students, but not donors. So I just wanted that to be clear. I understand and appreciate that clarification. In the last, the very little remaining time that we have, I know we've gone very long today and appreciate the endurance of both counsel. But you were talking about the essence of the bargain here going to the education and the degree. Could you speak to whether it's really the fungible education and degree or whether we need to be thinking here in terms of the Fox degree and the different value that goes with a particular brand or reputation? So that, for example, a school that sets itself up as the Harvard Marketing School and has no affiliation with Harvard, but folks see that, believe based on things that are represented to them that this is going to lead to a Harvard degree and therefore pay the tuition for that degree, aren't they defrauded? And how is that different than what we have here? So I think that that is something that is fundamentally different from what we have here because that is more like, you know, the fake Rembrandt or something like that because you're not actually getting instructed by Harvard professors. You're getting instructed by some fraudulent school's professors. Here, we have no doubt that this was a Fox business school. These students testified to the excellence of the education they received. It wasn't somebody posing as Fox. It's very different from something that is based on a third party ranking, particularly one that the government's own evidence showed is so ridiculous. So I think that's the answer to your honor's question. And you really have to look at the basic bargain that students are making with the business school when they pay tuition because that's the money that's being sought. Any other questions? Okay. Ms. Bureau, we'll give you just a moment. I'm sorry. Can I just make two quick points about the obtain? I just wanted to reiterate that the other statutes that I mentioned earlier and that your honor, Judge Crouch, referred to have essentially the same language. And as we point out in the reply brief, the Riley case doesn't discuss the meaning of obtain. It's irrelevant. And lastly, I just, my final point, your honor, is that my adversary keeps saying that the Supreme Court says the fraud statutes should be interpreted broadly when in fact, all the recent modern jurisprudence from McNally to Cleveland to Kelly to Simonelli to Skilling, all of those cases are crystal clear that to the contrary, like with other criminal statutes, the federal fraud statutes must be construed narrowly in order to avoid problems of fair notice, federalism, and they should be construed with an eye towards lenity. And that's what this court should do here. Thank you. We will ask the parties to share the cost of a transcript for proceedings today. We thank both counsel for a truly superb briefing and argument. In addition to that stamina that I mentioned earlier, and we will take the case under advisement.